UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC HUGH DIERKER,<br><br>                                    Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,<br><br>                                    Defendant. | Case No.:  18cv145-CAB(MSB)<br><br>**REPORT AND RECOMMENDATION<br>REGARDING CROSS-MOTIONS FOR<br>SUMMARY JUDGMENT<br>[ECF NOS. 11, 13]** |

This Report and Recommendation is submitted to the Honorable Cathy Ann Bencivengo, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Civil Local Rule 72.1(c) of the United States District Court for the Southern District of California.  On January 22, 2018, Plaintiff Eric Hugh Dierker filed a Complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security denying his application for a period of disability and disability insurance benefits.  (Compl., ECF No. 1.)

Now pending before the Court are the parties' cross-motions for summary judgment.  For the reasons set forth below, the Court **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, that the Commissioner's cross-motion for summary judgment be **DENIED**, and that Judgment be entered reversing the decision of

the Commissioner and remanding this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.  PROCEDURAL BACKGROUND

On May 29, 2014, Plaintiff filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, alleging disability beginning December 1, 2013.  (Certified Admin. R. 33, 167-75, ECF No. 8 ("AR").)  After his application was denied initially and upon reconsideration (id. at 103-05, 109-12), Plaintiff requested an administrative hearing before an administrative law judge ("ALJ"), (id. at 115-16).  An administrative hearing was held on June 21, 2016.  Plaintiff appeared at the hearing with counsel, and testimony was taken from him and a vocational expert ("VE").  (Id. at 49-81.)  At the hearing, Plaintiff amended his onset date to May 1, 2014.  (Id. at 53.)

As reflected in his November 1, 2016 hearing decision, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from May 1, 2014 through the date of the decision.  (Id. at 33-43.)  The ALJ's decision became the final decision of the Commissioner on November 22, 2017, when the Appeals Council denied Plaintiff's request for review.  (Id. at 5-8.)  This timely civil action followed.

## II.  SUMMARY OF THE ALJ'S FINDINGS

In rendering his decision, the ALJ followed the Commissioner's five-step sequential evaluation process.  See 20 C.F.R. § 404.1520.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 1, 2014, the alleged onset date.  (AR at 35.)  At step two, the ALJ found that Plaintiff had the following severe impairments:  bipolar disorder, history of alcoholism, anemia, low testosterone, follicular lymphoma, and mild degenerative joint disease of the knee.  (Id.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments.  (Id. at 36.)

/ / /

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to do the following:

> perform medium work as defined in 20 C.F.R. § 404.1567(c) except the claimant can lift and/or carry 50 pounds occasionally and 25 pounds frequently; the claimant can sit for 6 hours in an 8-hour workday with normal breaks; the claimant can stand and/or walk for 6 hours in an 8-hour workday with normal breaks; the claimant can understand, remember, and carry out non-complex tasks; the claimant can have occasional interaction with co-worker[s] and supervisors; the claimant can have no interaction with the public; and the claimant cannot perform any fast-paced work.

(Id. at 37.)

At step four, the ALJ adduced and accepted the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC would be unable to perform any of his past relevant work. (Id. at 41-42, 77-78.) The ALJ then proceeded to step five of the sequential evaluation process. Based on the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC could perform the requirements of occupations that existed in significant numbers in the national economy, such as industrial cleaner, kitchen helper, and packer, the ALJ found that Plaintiff was not disabled. (Id. at 42-43.)

### III. DISPUTED ISSUES

As reflected in Plaintiff's motion for summary judgment and the letter brief that Plaintiff subsequently submitted based on the Supreme Court's decision in Lucia v. SEC, 138 S. Ct. 2044 (2018), Plaintiff is raising the following issues as the grounds for reversal and remand:

1. Whether the ALJ was constitutionally appointed at the time of the decision in this case (ECF No. 19 at 1-2);

2. Whether the ALJ failed to properly evaluate the medical evidence in assessing Plaintiff's RFC, and specifically the opinions of Plaintiff's treating physician, Dr. Nita Paintal, and a consultative examiner, Dr. Gene Berg (Pl.'s Mot. Summ. J. 13-21, ECF No. 11-2 ("Pl.'s Mot."));

3.      Whether the Appeals Council failed to properly consider new medical evidence (id. at 21-22); and

4.      Whether the ALJ failed to properly evaluate Plaintiff's subjective symptom testimony (id. at 23-25).

### IV.  STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied.  DeLorme v. Sullivan, 924 F.2d 841, 846 (9th Cir. 1991).  Substantial evidence means "more than a mere scintilla" but less than a preponderance.  See Richardson v. Perales, 402 U.S. 389, 401 (1971); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 575-76 (9th Cir. 1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 401.  This Court must review the record as a whole and consider adverse as well as supporting evidence.  Green v. Heckler, 803 F.2d 528, 529-30 (9th Cir. 1986).  Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld.  Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984).

### V.  DISCUSSION

**A.      Plaintiff Forfeited his Appointments Clause Claim.**

Plaintiff asserts that this action should be remanded to the Commissioner because the ALJ who issued an unfavorable decision on Plaintiff's application for Social Security benefits was not appointed in accordance with the Appointments Clause of the United States Constitution, based on the United States Supreme Court's recent decision in Lucia, 138 S. Ct. 2044.  (See ECF No. 19 at 1.)  The Commissioner argues in response that Plaintiff forfeited his claim by failing to raise his "Appointments Clause challenge at any point in the administrative process."  (ECF No. 20 at 3.)

/ / /

/ / /

### 1.    Applicable law

In <u>Lucia</u>, the Supreme Court held that ALJs of the Securities and Exchange Commission ("SEC") are "Officers of the United States," and therefore subject to the Appointments Clause of the Constitution.  <u>Lucia</u>, 138 S. Ct. at 2055.  The Court stated that "'one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case' is entitled to relief."  <u>Id.</u> (quoting <u>Ryder v. United States</u>, 515 U.S. 177, 182-83 (1995)).  The Court determined that Lucia's challenge was timely because he had "contested the validity of [the ALJ's] appointment before the Commission, and continued pressing that claim in the Court of Appeals and this Court."  <u>Id.</u>

"Appointments Clause challenges are nonjurisdictional and may be waived or forfeited."  <u>Turner Bros., Inc. v. Conley</u>, —F. App'x—, —, 2018 WL 6523096, at *1 (10th Cir. 2018) (citing <u>Freytag v. Comm'r</u>, 501 U.S. 868, 878-79 (1991) (characterizing Appointments Clause objections as nonjurisdictional); <u>id.</u> at 893-94 ("Appointments Clause claims, and other structural constitutional claims, have no special entitlement to review," and may be waived or forfeited for failure to raise them at trial) (Scalia, J., concurring in part and concurring in the judgment)); <u>see also</u> <u>Jones Bros., Inc. v. Sec'y of Labor</u>, 898 F.3d 669, 678 (6th Cir. 2018) (stating that Appointments Clause challenges are "not jurisdictional and thus are subject to ordinary principles of waiver and forfeiture").  Courts have refused to reach constitutional claims under the Appointments Clause that were not timely asserted.  <u>See</u> <u>Kabani & Co., Inc. v. U.S. Sec. & Exch. Comm'n</u>, 733 F. App'x 918, 919 (9th Cir. 2018) (holding that petitioners forfeited their Appointments Clause claim by failing to timely raise it); <u>see also</u> <u>N.L.R.B. v. RELCO Locomotives, Inc.</u>, 734 F.3d 764, 798 (8th Cir. 2013) (holding that a party waived Appointments Clause challenge by failing to raise the issue before the agency); <u>Intercollegiate Broad. Sys. v. Copyright Royalty Bd.</u>, 574 F.3d 748, 755-56 (D.C. Cir. 2009) (declining to address Appointments Clause challenge to the Copyright Royalty Board members raised in supplemental briefing because it was "untimely").

## 2.    Analysis

Plaintiff concedes that he did not raise his Appointments Clause challenge during administrative proceedings, but maintains that "ordinary rules of waiver do not apply in Social Security proceedings and objections to an Agency decision can be made on any grounds for the first time in the District Court."  (ECF No. 19 at 1 (citing <u>Sims v. Apfel</u>, 530 U.S. 103, 110-11 (2000)).  The Ninth Circuit held in <u>Meanel v. Apfel</u>, 172 F.3d 1111, 1115 (9th Cir. 1999) that a claimant "must raise all issues and evidence <u>at their administrative hearings</u> in order to preserve them on appeal."  <u>Id.</u> (emphasis added).  In <u>Sims</u>, the case cited by Plaintiff, the Supreme Court stated that claimants need not "exhaust issues in a request for review by the Appeals Council in order to preserve judicial review of those issues," (<u>id.</u>, 530 U.S. at 111), but further explicitly noted that "[w]hether a claimant must exhaust issues before the ALJ is not before us[,]" (<u>id.</u> at 107).  In <u>Shaibi v. Berryhill</u>, 883 F.3d 1102, 1109 (9th Cir. 2017) decided after <u>Sims</u>, the Ninth Circuit stated that "[i]n light of the Court's express limitation on its holding in <u>Sims</u>, we cannot say that that holding is 'clearly irreconcilable' with our decision in <u>Meanel</u>, and <u>Meanel therefore remains binding on this court with respect to proceedings before an ALJ</u>."  <u>Id.</u> (emphasis added).  In addressing Appointments Clause challenges to Social Security ALJs, courts in this circuit have held that if a claimant does not present an issue during administrative proceedings, the issue is forfeited for purposes of federal court review.  <u>See</u> <u>Samuel F. v. Berryhill</u>, Case No. CV 17-7068-JPR, 2018 WL 5984187, at *2 n.6 (C.D. Cal. Nov. 14, 2018) ("To the extent <u>Lucia</u> applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during his administrative proceedings."); <u>Salmeron v. Berryhill</u>, Case No. CV 17-3927-JPR, 2018 WL 4998107, at *3 n.5 (C.D. Cal. Oct. 15, 2018) (same); <u>see also</u> <u>Harshaw v. Colvin</u>, No. 1:12–CV–01776–BAM, 2014 WL 972269, at *4 (E.D. Cal. Mar. 12, 2014) ("a complete failure to raise an issue during administrative proceedings" is not excused).

Plaintiff Dierker neither raised his Appointments Clause challenge before the ALJ who heard his case, nor before the Appeals Council.  He also did not raise the issue in his

"Motion for Summary Judgment or Remand," (see Pl.'s Mot.), and in his "Reply Memorandum in Further Support of Plaintiff's Motion for Summary Judgment," (see Reply Mem., ECF No. 16 ("Pl.'s Reply")), both filed after the Supreme Court's decision in Lucia, 138 S. Ct. 2944.  Plaintiff raised his challenge for the first time in his October 4, 2018 letter brief.  (See ECF No. 19.)  Plaintiff's failure to timely raise his Appointments Clause challenge forfeits the claim as untimely.

**B.**    **The ALJ Failed to Properly Evaluate Plaintiff's Subjective Symptom Testimony**.

Plaintiff contends that the ALJ failed to properly evaluate his testimony, and the ALJ's findings were insufficient to reject his statements regarding the nature and severity of his mental impairments.  (Pl.'s Mot. at 23-25.)  Plaintiff argues that his sporadic engagement in some daily activities for a short period of time on a good day does not contradict a finding that he cannot perform full-time work.  (Id.)  He further states that the ALJ did not explain how "objective" evidence in the record does not support Plaintiff's statements about his mental impairments.  (Id. at 25.)

The Commissioner argues that the ALJ provided specific and valid reasons for discounting Plaintiff's allegations.  (Def.'s Cross Mot. Summ. J. 24, ECF No. 13-1 ("Def.'s Mot."); Reply 7, ECF No. 17 ("Def.'s Reply").)  Defendant states that the ALJ pointed out that Plaintiff engaged in activities that were inconsistent with his complaint of debilitating fatigue, stress, problems concentrating, and anxiety, and Plaintiff's allegations of disabling symptoms were inconsistent with the objective examination findings in his treatment records.  (Id. at 24, 26-27.)

At the administrative hearing, Plaintiff testified that he stopped working in April 2014 because "I lost all my confidence in talking to people.  I can get super nervous about talking on the phone. . . . [A]nd I was nervous all the time and it was making my situation, my emotional situation just, I couldn't handle the stress."  (AR at 53.)  He stated he cannot work because of difficulties with concentration and retaining information, anxiety, and dealing with other people; and that when he is under pressure it "sends [him] into a horrible state of anxiety."  (Id. at 55-56.)   He cannot concentrate

on something for more than fifteen minutes at a time.  (Id. at 56.)  He also feels fatigued during the day and gets tired doing anything for a long period of time.  (Id. at 57.)

During the day, Plaintiff tries to do a list of chores his wife leaves him.  (Id. at 58.) However, some days he cannot even do household chores; his wife does not put any pressure on him to get them done.  (Id.)  Plaintiff occasionally picks up some items from a grocery store about a mile from his home.  (Id. at 59.)  He also picks up his six-year-old son from school, which is two blocks away, and stays home with his son for about an hour-and-a-half until his wife gets home.  (Id.)  Plaintiff's son "gets his time on tablet and he gets his little time watching animal shows on TV and he takes a bath . . . it's pretty minimal activity."  (Id. at 67.)

Plaintiff goes to the gym on a regular basis, but cannot stay there for more than 20 to 25 minutes.  (Id. at 57-58.)  Plaintiff took a trip to visit his wife's family in Vietnam, but spent most of the time in their room.  (Id. at 59.)  He enjoys writing, but cannot do it for long periods of time.  (Id. at 59-60, 62.)  He watches television during the day, but feels he cannot concentrate on a program for more than 10 minutes at a time.  (Id. at 63-64.)  Plaintiff does not socialize with others and typically isolates himself at home, and has difficulty engaging in conversations with others.  (Id. at 66-67, 72.)  He has good days and bad days, and estimated having bad days at least once a week when he does not get anything accomplished.  (Id. at 73-75.)

## 1. Applicable law

If the claimant has produced objective medical evidence of an impairment or impairments that could reasonably be expected to produce some degree of pain and/or other symptoms, and the record is devoid of any affirmative evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of the claimant's pain and/or other symptoms only if the ALJ makes specific findings stating clear and convincing reasons for doing so.  See Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996); Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993); Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1991).  Further, it is incumbent on the ALJ to specify which statements

8

by plaintiff concerning his or her symptoms and functional limitations were not credible and/or in what respect(s) plaintiff's statements were not credible.  See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); Smolen, 80 F.3d at 1284.

**2.    Analysis**

With respect to Plaintiff's subjective symptom testimony, the ALJ made the following findings:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(AR at 39.)

Since the Commissioner has not argued that there was evidence of malingering, the Court will apply the "clear and convincing" standard to the ALJ's adverse credibility determination.  See Burrell v. Colvin, 775 F.3d 1133, 1136 (9th Cir. 2014) (applying "clear and convincing" standard where the government did not argue that a lesser standard should apply based on evidence of malingering); see also Ghanim v. Colvin, 763 F.3d 1154, 1163 n.9 (9th Cir. 2014) (same).

The first reason provided by the ALJ in support of his adverse credibility determination was Plaintiff's ability to participate in certain daily activities.  The ALJ characterized Plaintiff's testimony regarding his daily activities as follows:

> Despite these assertions of disability, the claimant acknowledged that he was able to go to the gym every day and use an elliptical machine for 20 to 25 minutes.  (See Testimony).  He stated that he was able to press 180 pounds with his legs, and he could bench press 40 pounds (id.).  He also was able to follow a daily list of chores that his wife wrote for him each day, which included chores such as doing the laundry, dishes, grocery shopping, picking up his son from school (id.).  In addition, the claimant was able to [go] to Vietnam to visit his wife's family, watch movies on Netflix, and write a spiritual article comprised of 2,400 words, about once a week, for publication (id.).

9

(AR at 38.)

The ALJ then stated that "[t]he claimant's ability to participate in such activities undermines the consistency of the claimant's allegations of disabling functional limitations." (Id.) The ALJ also observed that "[s]ome of the physical and mental activities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment." (Id.)

The Ninth Circuit has noted that there are "two grounds for using daily activities to form the basis of an adverse credibility determination": evidence of the daily activities either (1) contradicts the claimant's other testimony, or (2) meets the threshold for transferable work skills. See Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007). Here, it appears that the ALJ was invoking the second ground. However, the ALJ failed to specify which of the described daily activities met the threshold for transferable work skills. Moreover, the ALJ did not consider Plaintiff's statements about his daily activities in their full context. For example, as stated above, Plaintiff testified that he regularly goes to a gym, but he also stated that he exercises "because exercise is recommended, insisted upon by my oncologist, my GP, my therapist and my psychiatrist and so that's just like a prescription." (AR at 56.) After getting home from the gym, Plaintiff lays down for 30 minutes because he "[gets] a lot of fatigue." (Id. at 57.) Although there are days when he prepares "a non-cooking lunch, take[s] a shower, and do[es] laundry," (id. at 58), there are days when he cannot brush his teeth or take a shower, (id. at 76).

Plaintiff also stated that writing is his hobby "that's pretty heavily insisted upon that I spend some time doing it every day. My therapist and I really shot for 20 minutes at a time, but I just couldn't handle it . . . ." (Id. at 59-60.) Plaintiff writes about 15 minutes per day and then takes a break; he cannot do it for a longer period of time because he loses concentration. (Id. at 60, 63.) The longest article he had written reached 2,400 words. (Id. at 60-61.) Plaintiff writes about "spiritual" subjects and shares his writings with a "support group of writers," which "is really helpful and

18cv145-CAB(MSB)

encouraging." (Id. at 60.) Dierker explained that by "publishing" his writing, he was referring to "show[ing] it to the group." (Id. at 62.)

Plaintiff also watches documentaries on Netflix, but "[a] documentary with the massive information coming on it [i]s difficult." (Id. at 64.) He watches it "about ten minutes at a time," and "with Netflix, [he] can put it on pause, go get a drink of water, walk around the house, do some breathing and go sit back down." (Id.)

When considered in their full context, Plaintiff's daily activities did not provide a reasonable basis for finding that they were the same as those necessary for employment. See Ghanim, 763 F.3d at 1165 (finding that ALJ improperly relied on evidence of claimant's daily activities for adverse credibility determination where claimant stated she performed only limited activities, sometimes with help); Garrison v. Colvin, 759 F.3d 995, 1016 (9th Cir. 2014) (same, where claimant stated she performed activities with assistance, on a limited basis, and with frequent rest; noting that "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication") (quoting Smolen, 80 F.3d at 1287 n.7); Reddick, 157 F.3d at 722-23 & n.1 (same, where ALJ did not properly consider claimant's statements about her daily activities in full context, which indicated claimant performed them with weakness and fatigue, requiring periodic rest); see also Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) ("the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.").

The only other reason the ALJ provided in support of his adverse credibility determination was that "[t]he consistency of the claimant's allegations regarding the severity of his symptoms and limitations is diminished because those allegations are greater than expected in light of the objective evidence of record." (AR at 40.) However, since the ALJ's first reason was legally insufficient to support his adverse

18cv145-CAB(MSB)

credibility determination, this remaining reason (i.e., the lack of objective medical support for Plaintiff's statements regarding his mental impairments) cannot be legally sufficient by itself.  See Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883-84 (9th Cir. 2006) (where ALJ's initial reason for adverse credibility determination was legally insufficient, his sole remaining reason premised on lack of medical support for claimant's testimony was legally insufficient); Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997) ("[A] finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain."); see also 20 C.F.R. 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.").  Accordingly, the ALJ failed to properly evaluate Plaintiff's subjective symptom testimony.

**C.**     **The ALJ Failed to Properly Evaluate the Medical Opinion Evidence.**

Plaintiff contends that the ALJ failed to properly evaluate the opinions of Dr. Nita Paintal, his treating psychiatrist, and Dr. Gene Berg, an examining psychologist.  (See Pl.'s Mot. at 13-21; Pl.'s Reply at 2-4.)

**1.     Applicable Law**

Three types of physicians may offer opinions in Social Security cases:  (1) those who directly treated the claimant, (2) those who examined but did not treat the claimant, and (3) those who did neither.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  A treating physician's opinion is generally entitled to more weight than an examining physician's opinion, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's opinion.  Id.  This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.  Smolen, 80 F.3d at 1285.  Under the regulations governing claims such as Plaintiff's filed before March 27, 2017, if a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not

18cv145-CAB(MSB)

inconsistent with the other substantial evidence in the record, it should be given controlling weight. See 20 C.F.R. § 404.1527(c)(2). If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors. See 20 C.F.R. § 404.1527(c)(2)-(6).

If the treating physician's opinion is uncontroverted by another doctor, it may be rejected only for "clear and convincing" reasons. See Lester, 81 F.3d at 830; Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991). Where a treating physician's opinion is controverted, it may be rejected only if the ALJ makes findings setting forth specific and legitimate reasons that are based on the substantial evidence of record. See Reddick, 157 F.3d at 725 ("A treating physician's opinion on disability, even if controverted, can be rejected only with specific and legitimate reasons supported by substantial evidence in the record."); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).

The opinion of an examining physician is entitled to greater weight than the opinion of a nonexamining physician. Lester, 81 F.3d at 830; Gallant, 753 F.2d at 1454 (9th Cir. 1984). The Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. Lester, 81 F.3d at 830. Even if contradicted by another doctor, the opinion of an examining physician may only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. Id. at 830-31; Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995).[1]

///

---

[1] The Court notes that the opinions of both Dr. Paintal and Dr. Berg were controverted by the opinion of Dr. Douglas Engelhorn, a consultative examiner, as reflected in his psychiatric examination report dated January 11, 2016, and his accompanying Medical Source Statement assessment form. (See AR at 431-38.) Therefore, the key issue is whether the ALJ provided specific and legitimate reasons based on the substantial evidence of record for not crediting the opinions of Dr. Paintal and Dr. Berg.

18cv145-CAB(MSB)

## 2. Analysis

### a. Dr. Paintal

The Court has reviewed all of Dr. Paintal's treatment records.  Dr. Paintal began treating Plaintiff on December 31, 2013.  (AR at 345, 349.)  Plaintiff was noted to have a significant history of both mental illness and alcohol use.  Plaintiff stated that he stopped taking his psychotropic medications in April 2013, as he felt they made his thinking foggy and he could not function on them; he self-medicated with alcohol, believing that alcohol helped his symptoms.  (Id. at 345.)  Plaintiff described symptoms of racing thoughts, depression, anxiety, an inability to focus, irritability, poor sleep, increased energy, and a history of impulsive behavior.  (Id.)  A mental status examination revealed agitated behavior, hyperactive psychomotor activity, pressured and excessive speech, elevated mood, and tangential and circumstantial thinking.  (Id. at 348.)  Dr. Paintal diagnosed bipolar disorder and alcohol dependence, and rated Plaintiff's Global Assessment of Functioning ("GAF") score at 55.[2]  (Id.)  She prescribed Librium for detoxification, and Depakote ER and Seroquel for mood stability.  (Id. at 349.)

On January 14, 2014, Plaintiff reported that he had not used any alcohol since his previous visit.  (Id. at 341.)  He was sleeping better, but also having vivid dreams and at times confusing his dreams with reality.  (Id.)  He still had some depressive symptoms. (Id.)  No changes were made to Plaintiff's diagnoses or GAF score.  (Id. at 342.)  Dr. Paintal increased the dosages of Depakote ER and Seroquel.  (Id. at 343.)  At a visit on February 4, 2014, Plaintiff stated his symptoms were essentially unchanged since his prior visit, except he also felt "slow" when he first got up in the morning.  (Id. at 337.)  Dr. Paintal again increased the dosage of Seroquel.  (Id. at 339.)  By February 18, 2014,

---

[2]  A GAF rating in the range of 51-60 is indicative of "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Diagnostic and Statistical Manual of Mental Disorders, at 34 (4th ed.) ("DSM-IV").

Plaintiff stated that he had periods of depression when he lacked motivation, would sleep during the day, and not complete tasks. (Id. at 333.) No medication changes were made. (Id. at 335.)

Unfortunately, Plaintiff subsequently had an exacerbation of symptoms. On April 4, 2014, he was grandiose, telling Dr. Paintal "you don't even know who I am." (Id. at 330.) The psychiatrist stated it took ten minutes just to calm Plaintiff down. (Id.) Plaintiff admitted he had stopped his medication because it made him feel "dopey" and he claimed, "I need my mania to function." (Id.) He also admitted to a relapse on alcohol. (Id.) A mental status exam revealed agitated behavior; pressured, loud, and excessive speech; a labile affect; an irritable and labile mood; poor reasoning, impulse control, judgment, and insight; incoherent thought processes; and grandiose thought content. (Id. at 331.) Dr. Paintal prescribed Librium, but noted that Plaintiff refused the treatment recommendation. (Id. at 332.) At his visit the following week, Plaintiff stated that he took the course of Librium, but then started drinking again. (Id. at 326.) Dr. Paintal's mental status exam revealed hyperactive psychomotor behaviors; pressured and excessive speech; a labile mood; fair reasoning, impulse control, judgment, and insight; and flight of ideas. (Id. at 327.) Plaintiff agreed to start Abilify and another course of Librium. (Id. at 328.) On April 23, 2014, Plaintiff stated that he was doing better on his new medication and felt he was able to function at work. (Id. at 323.) Dr. Paintal increased the Abilify dosage. (Id. at 325.)

On May 27, 2014, Plaintiff related that he was "doing OK" but was not getting his work done in a timely manner as he felt scattered and unfocused. (Id. at 319.) He felt "angry with life." (Id.) Dr. Paintal diagnosed bipolar disorder and alcohol dependence. (Id. at 320.) No changes were made to Plaintiff's medication. (Id. at 321.) When seen on July 25, 2014, Plaintiff stated that he remained unmotivated and had been unable to work at all. (Id. at 316.) Even taking a shower was "a task" and his sleep was poor. (Id.) A mental status exam revealed flat affect. (Id. at 317.) Dr. Paintal added Lamictal to the other medications. (Id. at 318.) On August 25, 2014, Plaintiff described feeling

depressed and not feeling like doing anything. (Id. at 353.) His level of stress was somewhat better only because he was no longer working. (Id.) Plaintiff was advised to increase his dosage of Lamictal. (Id. at 355.)[3] No improvement was documented on October 8, 2014. (Id. at 373.) Plaintiff claimed to be unable to focus and having no motivation. (Id.) Dr. Paintal again increased the dosage of Lamictal. (Id. at 375.) On November 12, 2014, Plaintiff described some improvement in his depression. (Id. at 384.) However, he still claimed to have low motivation and that he felt frustrated at times. (Id.) Dr. Paintal increased the Lamictal dosage to address the low energy problem. (Id. at 386.) Subsequent visits documented no significant changes through February 6, 2015. Plaintiff continued to claim a lack of motivation. (See id. at 381-83, 459-62.)

In a Mental Impairment Questionnaire form dated February 11, 2015, Dr. Paintal diagnosed Plaintiff with bipolar disorder and alcohol dependence with a GAF score of 50. (Id. at 391, 395.) Clinical signs and symptoms supporting the diagnoses and assessment included a depressed mood, a constricted affect, hostility or irritability, manic syndrome, grandiose thoughts, difficulty thinking or concentrating, flight of ideas, decreased energy, impulsive or damaging behavior, pressured speech when Plaintiff is manic, and sleep disturbances, described as "intermitted awakening all night." (Id. at 392.) Plaintiff's most frequent and/or severe symptoms were racing thoughts, decreased need for sleep, irritability, and excessive drinking when not taking his medication. (Id. at 393.) Dr. Paintal opined that Plaintiff was not a malingerer, (id. at 391); that Plaintiff had episodes of decompensation or deterioration in a work or work-like setting that caused him to withdraw from that situation and/or experience an exacerbation of symptoms when he was unable to function due to poor focus and racing

---

[3] It appears from the electronic medical record ("EMR") of the August 25, 2014 visit that Dr. Paintal reassessed Plaintiff's current GAF at that time. However, the record does not reflect what the new rating was. (See id. at 354.)

18cv145-CAB(MSB)

thoughts, (id. at 393); and that the symptoms and limitations described in the report had been present since April 30, 2014, (id. at 395).

Dr. Paintal further opined that Plaintiff had "moderate-to-marked" limitations (defined as "symptoms frequently interfere with ability" or from "1/3 – 2/3 of an 8-hr. workday") in his ability to maintain attention and concentration for extended periods, perform activities within a schedule and consistently be punctual, and interact appropriately with the public, (id. at 394); and that Plaintiff had a "moderate" limitation (defined as "symptoms occasionally interfere with ability" or "up to 1/3 of an 8-hr. workday") in his ability to maintain socially appropriate behavior, (id.). Dr. Paintal estimated that Plaintiff would be absent from work, on average, more than three times per month due to his impairments. (Id. at 395.)

On March 18, 2015, Plaintiff related he felt the "same" as at his prior visit. (Id. at 455.) He described feeling "flat" and still not interested in doing anything; he also had difficulty starting and finishing tasks. (Id.) Plaintiff also reported symptoms of sadness and frustration over his situation. (Id.) Dr. Paintal discontinued the Abilify. (Id. at 457.) By April 7, 2015, Plaintiff reported feeling only a "little" better. (Id. at 452.) He was started on Latuda. (Id. at 454.) At his May 11, 2015 visit, Plaintiff stated that he had not yet started Latuda and he continued to feel "flat" with a lack of enthusiasm or interests. (Id. at 449.) A mental status exam confirmed he had a flat affect. (Id. at 450.) On June 22, 2015, Plaintiff stated he had started Latuda and it had helped improve his attitude, but he still felt not able to do things even though it improved his attitude. (Id. at 445.) Dr. Paintal increased the dose of Latuda. (Id. at 447.)

In a narrative report dated June 25, 2015, Dr. Paintal stated that Plaintiff was under her care for bipolar disorder and alcohol dependence in remission. (Id. at 428.) The treating psychiatrist noted that Plaintiff's mood symptoms included deep sadness, anhedonia, increased anxiety, racing thoughts, and poor sleep. (Id.) When he was working, Plaintiff had difficulty with focus and racing thoughts to the point others could not keep up with him. (Id.) He had also made impulsive business decisions that were

18cv145-CAB(MSB)

detrimental and engaged in binge drinking to cope with his mood symptoms. (Id.) Plaintiff made a commitment to stop drinking in April 2014, and has consistently followed treatment since then. (Id.) Despite some improvement with treatment, Dr. Paintal opined that Plaintiff had difficulties with motivating himself "to do anything other than his basic Activities of Daily Living." (Id.)

On July 20, 2015, Plaintiff related that he still had problems completing tasks, with motivation, and low interest, even though his negative thinking was improved. (Id. at 442.) He also described difficulty with sleep and needing to nap during the day. (Id.) At an August 18, 2015 visit, Plaintiff reported feeling "more upbeat." (Id. at 439.) However, he continued to struggle with focusing and staying on task, and he had problems with daily fatigue. (Id.) Unfortunately, by September 28, 2015, Plaintiff had a recurrence of his racing thoughts and worsening focus. (Id. at 665.) He also had persistent fatigue during the day. (Id.) Dr. Paintal considered an increase in Latuda due to increased symptoms. (Id. at 667.)[4] Plaintiff was back to his baseline by October 31, 2015. (Id. at 661.) This was short lived. On December 5, 2015, Plaintiff described feeling "not so good." (Id. at 657.) He had recently been diagnosed with Lymphoma. (Id.) He was depressed to the point of not taking care of his hygiene and sleeping only four hours at night. (Id.) Dr. Paintal's exam confirmed his mood was depressed. (Id. at 658.) She added Wellbutrin to Plaintiff's other medications. (Id. at 659.)[5]

On December 23, 2015, Plaintiff related that the Wellbutrin had helped and he was doing "ok." (Id. at 653.) Although his energy was improved, he still felt he could

_____

[4] In the EMR documenting the September 28, 2015 visit, Dr. Paintal rated Plaintiff's current GAF as of September 15, 2015 at 70. (Id. at 667.) A GAF rating in the range of 61-70 is indicative of "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful relationships." DSM-IV at 34.

[5] In the EMR documenting the December 5, 2015 visit, Dr. Paintal rated Plaintiff's current GAF as of November 3, 2015 at 65. (Id. at 659.)

not take on too much.  (Id.)  Dr. Paintal advised Plaintiff to increase his dosage of Wellbutrin.  (Id. at 655.)[6]  At a follow-up on January 22, 2016, Plaintiff reported improvement, but stated that he continued to have racing thoughts and still was struggling with focus for more than 20 minutes at a time.  (Id. at 649.)[7]  At the next visit on February 29, 2016, Plaintiff related that he was doing "ok," but focus continued to be an issue.  (Id. at 645.)  On April 18, 2016, Plaintiff stated he had increased problems with anxiety and depression due to the recent cancer diagnosis.  (Id. at 641.)  The mental status exam confirmed his mood was anxious.  (Id. at 642.)

Dr. Paintal completed a second Mental Impairment Questionnaire on May 9, 2016.  (Id. at 463, 467.)  She again diagnosed Plaintiff with bipolar disorder and alcohol dependence.  (Id. at 463.)  Plaintiff's clinical signs included a depressed mood, persistent or generalized anxiety, a labile mood, hostility or irritability, manic syndrome, difficulty thinking or concentrating, easy distractibility, anhedonia or pervasive loss of interests, appetite disturbances/weight change, decreased energy, hyperactivity, pressured speech, and alternating periods of excessive and decreased sleep.  (Id. at 464.)  Plaintiff's primary symptoms were depressed mood, lack of motivation, and lack of focus.  (Id. at 465.)  His mental status exams confirmed depression at times with flat affect and a history of manic symptoms in the past.  (Id.)  Dr. Paintal again noted that Plaintiff was subject to decompensation based on his history of such episodes when employed.  (Id.)  She stated that Plaintiff's symptoms and limitations as described in the questionnaire had been present since the end of April 2014.  (Id. at 467.)

Dr. Paintal opined that Plaintiff's symptoms frequently interfered with his ability (from 1/3 to 2/3 of an 8-hour workday) to carry out detailed instructions, maintain

---

[6]  In the EMR documenting the December 23, 2015 visit, Dr. Paintal rated Plaintiff's current GAF as of December 10, 2015 at 55.  (Id. at 655.)

[7]  In the EMR documenting the January 20, 2016 visit, Dr. Paintal rated Plaintiff's current GAF as of December 29, 2015 at 60.  (Id. at 651.)

18cv145-CAB(MSB)

attention and concentration for extended periods, complete a workday without interruptions from psychological symptoms, and adhere to basic standards of neatness. (Id. at 466.)  In addition, she opined that Plaintiff's symptoms occasionally interfered with his ability (up to 1/3 of an 8-hour workday) to work in coordination with or near others without being distracted by them; and that Plaintiff would miss work, on average, more than three times a month due to his impairments or treatment.  (Id. at 466-67.)

On May 24, 2016, Plaintiff related that he was doing "bad" as he felt his medications were not working, he was not sleeping well at night, and he felt anxious with racing thoughts.  (Id. at 637.)  He also described feeling so fatigued during the day that he was not engaging in any activities.  (Id.)  Plaintiff had little interest in doing things and had to "force" himself to even do chores around the house.  (Id.)  The mental status exam confirmed he was anxious.  (Id. at 638.)  Dr. Paintal recommended that Plaintiff discontinue the Latuda as it might be the cause of his increased anxiety, and that he start Seroquel again.  (Id. at 640.)  At a follow-up visit on June 15, 10 2016, Plaintiff reported that he was sleeping better, but he remained depressed and fatigued during the day.  (Id. at 633.)  He also had anxiety that interfered with him showering at times.  (Id.)  Dr. Paintal increased the dosage of Seroquel.  (Id. at 635.)

In his decision, the ALJ stated the following with respect to Dr. Paintal's opinions:

> The undersigned has read and gives less weight to the mental impairment questionnaires, dated February 11, 2015 and May 9, 2016, and narrative report, dated June 25, 2015, by Nita Paintal, M.D., a treating psychiatrist, who asserted the claimant had moderate to marked mental limitations and a GAF score of 50 (6F, pp. 1-5; 8F, pp. 1-2; 11F, pp. 1-5).  These assessment[s] are not fully consistent with the objective treatment records of Dr. Paintal, which show the claimant's symptoms improved with his medication regimen and when he stopped drinking alcohol (5F, pp. 1-2). Dr. Paintal also reported the claimant had fairly intact mental status exams and GAF scores of 55 (3F, p. 9), indicating moderate mental symptoms (id.).

(Id. at 40.)

As the Ninth Circuit observed with regard to mental health issues:

Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.  See, e.g., Holohan v. Massanari, 246 F.3d 1195, 1205 (9th Cir. 2001) ("[The treating physician's] statements must be read in context of the overall diagnostic picture he draws.  That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.").  Reports of "improvement" in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms.  See Ryan, 528 F.3d at 1200–01 ("Nor are the references in [a doctor's] notes that Ryan's anxiety and depression were 'improving' sufficient to undermine the repeated diagnosis of those conditions, or [another doctor's] more detailed report.").  They must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace.  See, e.g., Hutsell [v. Massanari], 259 F.3d [707], 712 [(8th Cir. 2001)] ("We also believe that the Commissioner erroneously relied too heavily on indications in the medical record that Hutsell was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity.").

Garrison, 759 F.3d at 1017 (footnotes omitted).

Here, in asserting that Dr. Paintal's treatment records showed that Plaintiff's symptoms improved with his medication regimen and when he stopped drinking alcohol, the ALJ did precisely what the Ninth Circuit cautioned against in Garrison.  See id.  The ALJ picked out a few isolated instances of improvement over a period of months and years, and treated them as a basis for concluding that Plaintiff was capable of working.  Further, the ALJ failed to consider Dr. Paintal's statements about improvement in the context of the overall diagnostic picture Dr. Paintal's treatment records drew, and the ALJ seemingly failed to consider that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can

18cv145-CAB(MSB)

function effectively in a workplace. Plaintiff here suffered from bipolar disorder. As the Ninth Circuit noted in Garrison, "[t]he very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated." Id., 759 F.3d at 1017 n.23 (quoting Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011)).

As for the ALJ's reference of Plaintiff's "fairly intact mental status exams," the Court is mindful of authority for the proposition that contradictions between a treating physician's opinion and his own treatment notes constitutes a legally sufficient reason for rejecting the treating physician's opinion. See, e.g., Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 692-93 (9th Cir. 2009); Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005). However, as the Ninth Circuit also noted in Garrison, "[i]ndividuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms would indicate." Garrison, 759 F.3d at 1017 n.22 (quoting Hutsell, 259 F.3d at 711). Here, there is no indication in the ALJ's decision that he considered the limited relevance of Dr. Paintal's mental status exam findings to her opinions regarding Plaintiff's mental work-related limitations.

As for the ALJ's reference to the GAF scores reported by Dr. Paintal, the Ninth Circuit noted that

> GAF scores are typically assessed in controlled, clinical settings that may differ from work environments in important respects. See, e.g., Titles II & XVI:  Capability to Do Other Work–Themedical–Vocational Rules As A Framework for Evaluating Solely Nonexertional Impairments, SSR 85–15, 1983–1991 Soc. Sec. Rep. Serv. 343 (S.S.A 1985) ("The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day.").

18cv145-CAB(MSB)

<u>Garrison</u>, 759 F.3d at 1003 n.4. In this case, there is no indication in the ALJ's decision that he considered the limited relevance of Plaintiff's GAF scores to the rest of Dr. Paintal's opinions.

For the foregoing reasons, the Court finds that the ALJ failed to properly evaluate the opinions of Dr. Paintal.

### b. Dr. Berg

Dr. Berg evaluated Plaintiff on June 17, 2016. (AR at 622.) Plaintiff's mental status examination revealed a sad, depressed, and anxious mood and affect, difficulties with attention and concentration, nervousness and anxiety, disturbed sleep, feelings of hopelessness and helplessness, fatigue, a history of euphoric episodes, and circumstantial thinking. (<u>Id.</u> at 622-23.) Psychological testing revealed findings consistent with a high chronic level of depression. (<u>Id.</u> at 624.) Dr. Berg diagnosed Plaintiff with bipolar disorder and alcohol dependence, and opined that Plaintiff's prognosis was "guarded." (<u>Id.</u> at 625-26.)

In a Mental Impairment Questionnaire, Dr. Berg reiterated Plaintiff's diagnoses. (<u>Id.</u> at 628.) Dr. Berg identified clinical signs and symptoms supporting these diagnoses, including a depressed mood, persistent or generalized anxiety, an irritable affect, manic syndrome, grandiose thoughts, illogical thinking, difficulty thinking or concentrating, easy distractibility, poor recent memory, persistent irrational fears, anhedonia/ pervasive loss of interests, decreased energy, impulsive or damaging behavior, psychomotor retardation, pressured speech, social withdrawal or isolation, and sleep disturbances. (<u>Id.</u> at 629.) According to Dr. Berg, Plaintiff's most frequent and severe symptoms included difficulties with concentration and sleep, low energy, and fatigue. (<u>Id.</u> at 630.)

Dr. Berg noted that Plaintiff had "moderate-to-marked" limitations ("symptoms frequently interfere with ability" or from "1/3 – 2/3 of an 8-hr. workday") in his ability to do the following: understand, remember, and carry out one-to-two step and detailed instructions; maintain attention and concentration for extended periods; work in

coordination with or near others without being distracted by them; make simple work-related decisions; complete a workday without interruptions from psychological symptoms; interact appropriately with the public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them; maintain socially appropriate behavior; adhere to basic standards of neatness; respond appropriately to workplace changes; be aware of hazards and take appropriate precautions; and set realistic goals.  (Id. at 631.)  Dr. Berg further opined that Plaintiff had "moderate" limitations ("symptoms occasionally interfere with ability" or "up to 1/3 of an 8-hr. workday") in his ability to remember locations and work-like procedures; perform activities within a schedule and consistently be punctual; sustain ordinary routine without supervision; perform at a consistent pace without rest periods of unreasonable length or frequency; and travel to unfamiliar places or use public transportation.  (Id.)  Dr. Berg also opined that Plaintiff had a "marked" limitation (defined as "symptoms constantly interfere with ability" or "more than to 2/3 of an 8-hr. workday") in his ability to make plans independently.  (Id.)  Dr. Berg further noted that Plaintiff would likely be absent from work as a result of his impartment more than three times per month.  (Id. at 632.)

In his decision, the ALJ stated the following with respect to Dr. Berg's psychological assessment:

> The undersigned has read and gives less weight to the psychological assessment, dated June 17, 2016, by Gene Berg, Ph.D., a consulting psychologist, who reported the claimant would not be able to perform any work activity, interact with others, or handle routine work changes, due to bipolar disorder and history of alcohol dependence (13F, pp. 1-5; 14F, p. 1; 15F, pp. 1-5).  As discussed above, the claimant's objective treatment records show he had depression, but his mental status exams were nearly all normal (10F, p. 1; 5F, pp. 1-2; 3F, p. 2).  Moreover, just a few days earlier, the results of the claimant's consultative evaluation by Dr. Engelhorn showed that he had a low-grade depression, but he was fully

capable of various daily activities such as carrying for his young son and writing, and performing simple, detailed, and complex tasks (9F, pp. 2-9).

(<u>Id.</u> at 40.)

As a preliminary matter, it is unclear from the above-quoted paragraph whether the ALJ merely was rejecting the opinions of Dr. Berg that the ALJ specifically cited, or rejecting Dr. Berg's entire assessment of Plaintiff's ability to perform mental work-related activities. The Court notes in this regard that, while the ALJ failed to specifically incorporate into his RFC any of the "moderate-to-marked" limitations and "moderate" limitations found by Dr. Berg, the ALJ did preclude Plaintiff from performing work involving complex tasks, any interaction with the public, and any fast-paced work, and did limit Plaintiff to only "occasional interaction with co-worker and supervisors." (<u>See</u> <u>id.</u> at 37.)

As for the ALJ's reference to Dr. Engelhorn's consultative evaluation, it does not reference Plaintiff's writing. At the administrative hearing, as discussed above, Plaintiff did testify that he spent about 15 minutes per day writing and that he could not do it for a longer period of time because he lost concentration. (<u>Id.</u> at 60, 63.) Plaintiff also testified that picked up his six-year-old son from school, which was two blocks away, and stayed home with his son for about an hour-and-a-half until his wife got home. (<u>Id.</u> at 59.) Neither of those daily activities undermines or contradicts Dr. Berg's assessment of Plaintiff's ability to perform mental work-related activities. Further, the fact that Dr. Berg's opinions were controverted by and inconsistent with the opinions of another examining physician, Dr. Engelhorn, was not a legally sufficient reason for rejecting Dr. Berg's opinions; rather, it was determinative of the standard to be applied to the ALJ's proffered reasons for not crediting Dr. Berg's opinions. <u>See</u> <u>Lester</u>, 81 F.3d at 830 (in the event of conflict in the medical opinion evidence, an ALJ still must provide legally sufficient reasons to reject a treating or examining physician's opinion); <u>see also</u> <u>Widmark v. Barnhart</u>, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006) (existence of a conflict

among the medical opinions by itself cannot constitute substantial evidence for rejecting a treating physician's opinion).

Turning to the ALJ's reference to the three cited mental status exams that the ALJ characterized as "nearly all normal," the mental status exams cited by the ALJ were not performed by Dr. Berg, but by Plaintiff's treating physician, Dr. Paintal. (See AR at 40, 354, 381-82, 439-40.) As discussed above with respect to Dr. Paintal's opinions regarding Plaintiff's mental work-related limitations, the mental status exam findings were only of limited relevance to those opinions because, as the Ninth Circuit has recognized, individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress, and reduce their signs and symptoms; and such individuals may be much more impaired for work than their signs and symptoms would indicate. See Garrison, 759 F.3d at 1017 n.22. Dr. Paintal's mental status exam findings were of even less relevance to Dr. Berg's opinions, since his examination report reflects that his opinions were based on his review of 30 pages of medical/psychiatric documentation relating to Plaintiff's medical/psychiatric history, as well as the following documents: a psychological history questionnaire and mental status examination administered to Plaintiff by Dr. Berg; a Patient Health questionnaire completed by Plaintiff; test findings from a series of tests administered by Dr. Berg to Plaintiff; Dr. Berg's own observations and examination of Plaintiff; Plaintiff's description to Dr. Berg of his problems; and Plaintiff's relevant background history (as related to Dr. Berg by Plaintiff). (See AR at 622-26.) There is no indication in the ALJ's decision that he considered the very limited relevance of Dr. Paintal's mental status exam findings to Dr. Berg's opinions regarding Plaintiff's mental work-related limitations.

For the foregoing reasons, the Court finds that the ALJ also failed to properly evaluate the opinions of Dr. Berg.

/ / /

/ / /

/ / /

**D.  Appeals Council Review.**

Plaintiff argues that the Appeals Council failed to properly consider additional medical evidence from Dr. Paintal.  (See Pl.'s Mot. at 21-22; Pl.'s Reply at 4-5.)  Plaintiff asserts that the evidence from Dr. Paintal is new and not duplicative, and addresses the ALJ's concern that the opinions from Plaintiff's psychiatrist were inconsistent with mental status findings at office visits.  (See Pl.'s Mot. at 21-22.)  Plaintiff further contends that the Court may properly "review the record as a whole, including the new evidence provided to the Appeals Council, to determine if the ALJ's decision is supported by substantial evidence."  (See Pl.'s Reply at 5 (citing Taylor v. Comm'r of Soc. Sec., 659 F.3d 1228, 1232-33 (9th Cir. 2011).)  Plaintiff argues that remand to consider Dr. Paintal's evidence submitted to the Appeals Council is necessary because it may change the weight given to the treating source opinions.  (See Pl.'s Mot. at 22; Pl.'s Reply at 5.)

The Commissioner counters that substantial evidence continues to support the ALJ's findings notwithstanding Plaintiff's later-submitted evidence.  (Def.'s Mot. at 19-23; Def.'s Reply at 6-7.)  Defendant initially asserts that the Appeal Council's denial of Plaintiff's request for review is not a final agency action subject to judicial review and this Court does not have jurisdiction to review the Appeal Council's actions.  (Def.'s Mot. at 20 (citing 42 U.S.C. § 405(g); 20 C.F.R. § 422.210; Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d 1157, 1159-60 (9th Cir. 2012); Taylor, 659 F.3d at 1231.)  The Commissioner further maintains that the evidence submitted to the Appeals Council from Dr. Paintal does not relate back to the ALJ's decision, is duplicative, "proffers post hoc explanations" of Dr. Paintal's treatment notes, and lacks objectivity.  (See Def.'s Mot. at 21-22; Def.'s Reply at 7.)

**1.  Applicable Law**

District courts "do not have jurisdiction to review a decision of the Appeals Council denying a request for review of an ALJ's decision, because the Appeals Council's decision is a non-final agency action."  Brewes, 682 F.3d at 1161 (citing Taylor, 659 F.3d

27

at 1231). "When the Appeals Council declines review, 'the ALJ's decision becomes the final decision of the Commissioner,' and the district court reviews that decision for substantial evidence, based on the record as a whole." Id. at 1161-62 (citations omitted).

The Ninth Circuit held in Brewes, that when a claimant submits evidence for the first time to the Appeals Council, and the Council considers the evidence in denying review of the ALJ's decision, the new evidence is considered be part of the administrative record. Id. at 1162. "The Appeals Council will review a case if . . . the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision," and the claimant shows good cause for not submitting the evidence earlier. 20 C.F.R. § 404.970(a)-(b).

## 2. Analysis

The ALJ issued a written decision in this case on November 1, 2016. (See AR at 33-43.) When Plaintiff sought review by the Appeals Council, he submitted for the first time medical evidence consisting of the following documents from his treating psychiatrist Dr. Paintal: (1) a narrative report dated April 21, 2017, (2) a letter dated April 21, 2017, and (3) a Mental Impairment Questionnaire dated May 18, 2017. (Id. at 16-22.) In its November 22, 2017 order, the Appeals Council denied review after finding that Plaintiff's additional evidence provided no basis for changing the ALJ's decision. (See id. at 5-8.) The Appeals Council stated that the ALJ decided Plaintiff's case through November 1, 2016, and the documents from Dr. Paintal "[did] not relate to the period at issue." (Id. at 6.) The Appeals Council concluded that the later-submitted evidence did not affect the ALJ's determination that Plaintiff was not disabled on or before November 1, 2016. (Id.)

The evidence from Dr. Paintal submitted to the Appeals Council is part of the record in this case because the Appeals Council considered it in its decision to deny

Plaintiff's request for review.  See Brewes, 682 F.3d at 1162; see also Carmickle v. Colvin, 645 F. App'x. 575, 576 (9th Cir. 2016) (concluding that under Brewes, additional evidence, which the Appeals Council considered in declining to review the ALJ's decision denying benefits, became part of the administrative record).  Although this Court may not review the Appeals Council's reasoning for denying review of the ALJ's decision, the Court may review the evidence submitted to the Appeals Council.  See Luther v. Berryhill, 891 F.3d 872, 876 (9th Cir. 2018) ("the Appeals Council's reasoning for denying review is not considered on subsequent judicial review."); see also Taylor, 659 F.3d at 1231-32.

### a. April 21, 2017 Letter

Dr. Paintal stated in her April 21, 2017 letter that her patient, Eric Hugh Dierker, "is currently not using drugs and/or alcohol and remains disabled."  (AR at 21.)  The letter post-dates the ALJ's decision and does not reference the relevant time period in this case.  (See id.)  Further, the letter is written in the present tense, indicating that it assesses Plaintiff's condition as of April 21, 2017, and nothing in the letter indicates that it was intended to provide a retrospective assessment of Plaintiff's medical condition. The evidence therefore does not relate to the period on or before the date of the ALJ's decision, and does not provide a basis for reversing the ALJ's decision or remanding the case.  See Brewes, 682 F.3d at 1162 & n.3; see also Bales v. Berryhill, 688 F. App'x 495, 496 (9th Cir. 2017) (finding that the evidence submitted to the Appeals Council was not "retrospective in nature" when it did "not indicate that [it] relate[d] back to the relevant period."); Lewis v. Colvin, Civil No. 12cv2073 AJB(RBB), 2013 WL 4517252, at *26 (S.D. Cal. Aug. 21, 2013) (finding that the new evidence submitted to the Appeals Council did not warrant reversal or remand, where the evidence postdated the ALJ's decision, did not reference the relevant time period, contained medical opinion written in the present tense, and did not otherwise indicate that it was intended to provide a retrospective assessment of plaintiff's medical condition).

/ / /

### b.    April 21, 2017 Narrative Report and May 18, 2017 Mental Impairment Questionnaire

Dr. Paintal noted in her April 21, 2017 narrative report that she had treated Plaintiff since December 31, 2013, and that Plaintiff was diagnosed with bipolar disorder alcohol dependence in partial remission. (AR at 22.) She then stated, in relevant part, the following:

> I would like to clarify that even though [Plaintiff] is doing well at one level because of the extensive treatment he is receiving, returning to any form of employment is not an option because he will have a recurrence of symptoms due to the highly stressful environment that he worked in and this in turn will lead to relapse on alcohol. In my clinical notes that are written when he is at my office, he does present well, he is euthymic in mood and he shows no objective evidence of depression or mania. However, he continues to struggle with periods of depression and anhedonia and he has to continue to work at keeping himself in a euthymic state and to function with his dysfunction.

(Id.)

In a Mental Impairment Questionnaire dated May 18, 2017, Dr. Paintal diagnosed Plaintiff with bipolar disorder and alcohol dependence, and noted that Plaintiff's primary symptoms were depressed mood, lack of energy and motivation, and poor impulse control that leads to alcohol use. (Id. at 16, 18, 20.) She noted that Plaintiff had "moderate-to-marked" limitations in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a workday without interruptions from psychological symptoms, and adhere to basic standards of neatness. (Id. at 19.) Dr. Paintal stated that Plaintiff had experienced episodes of decompensation or deterioration in a work or work-like setting that caused him to withdraw from that situation or experience an exacerbation of symptoms, and explained that "[increase in] stress can lead to mood changes & decompensation." (Id. at 18.) With respect to Plaintiff's work-related limitations, she added that "[a]ny degree

of stress can cause exacerbation of symptoms," and opined that Plaintiff would be absent from work more than three times a month due to his impairments. (Id. at 20.)

The Court disagrees with the Commissioner's contention that the additional evidence from Dr. Paintal does not relate back to the time period adjudicated in the ALJ's decision. (See Def.'s Mot. at 21-22.)  Although the Mental Impairment Questionnaire and the narrative report post-dated the ALJ's November 1, 2016 decision, (see id. at 16-20, 22, 33-43), this fact is not dispositive of whether the evidence was chronologically relevant; rather, the evidence is chronologically relevant if it related to a claimant's condition on or before the date of the ALJ's decision.  See Baker v. Colvin, Case No. 16-cv-00771-EMC, 2016 WL 5869944, at *4 (N.D. Cal. Oct. 7, 2016) (citing Williams v. Sullivan, 905 F.2d 214, 215-16 (8th Cir. 1990) (finding that a psychiatrist's report generated and submitted to the Appeals Council after the ALJ's decision was not chronologically irrelevant because the "timing of the examination is not dispositive of whether evidence is material")).

The above records addressed Plaintiff's bipolar disorder and alcohol dependence, impairments that Dr. Paintal diagnosed and reported before the date of the ALJ's decision, and corroborated her earlier opinions that Plaintiff had several "moderate-to-marked" limitations in various areas of mental functioning.  (See AR at 16-20, 22, 391-95, 463-67.)  Further, Dr. Paintal specifically noted in the May 18, 2017 Mental Impartment Questionnaire that Plaintiff's "symptoms and related limitations as detailed in [the] questionnaire apply as far back as [] 04/30/2014," (id. at 20), and her April 21, 2017 narrative report appears to be directly responsive to the ALJ's decision to assign less weight to Dr. Paintal's earlier opinions because they were "not fully consistent with [her] objective treatment records," (id. at 22, 40).  The evidence was new and material, and related to the period of time on or before the date of the ALJ's decision.  See Mayes v. Massanari, 276 F.3d 453, 462 (9th Cir. 2001) (to be material, the new evidence must bear "directly and substantially on the matter in dispute"); Taylor, 659 F.3d at 1233 ("Because Dr. Thompson's opinion concerned his assessment of [plaintiff's] mental

health since his alleged disability onset date in 1999, it related to the period before [plaintiff's] disability insurance coverage expired in 2004, and before the ALJ's decision in 2006."); see also Crawford v. Colvin, No. ED CV 15–1436–PLA, 2016 WL 1237342, at *7 (C.D. Cal. Mar. 28, 2016) (finding that post-decision medical opinions "'relate to' the time period considered by the ALJ because they report on the same conditions plaintiff claimed as the bases of her disability and that the ALJ found to be severe impairments"). Although Dr. Paintal's April 21, 2017 narrative report and May 18, 2017 Mental Impartment Questionnaire were chronologically relevant, and contained new and material evidence, the Court need not reach the issue whether the evidence provided the basis to change the ALJ's decision because, as discussed in detail above, the Court has found that the ALJ failed to properly evaluate the opinions of Dr. Paintal.

## IV. CONCLUSION AND RECOMMENDATION

The decision whether to remand for further proceedings or simply to award benefits is within the discretion of the Court. See Salvador v. Sullivan, 917 F.2d 13, 15 (9th Cir. 1990); McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989); Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981). Remand for further proceedings is warranted where additional administrative proceedings could remedy defects in the decision. See Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984); Lewin, 654 F.2d at 635. Remand for the payment of benefits is appropriate where no useful purpose would be served by further administrative proceedings, Kornock v. Harris, 648 F.2d 525, 527 (9th Cir. 1980); where the record has been fully developed, Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); or where remand would unnecessarily delay the receipt of benefits to which the disabled Plaintiff is entitled, Bilby v. Schweiker, 762 F.2d 716, 719 (9th Cir. 1985).

The Court is mindful of Ninth Circuit authority for the proposition that, where an ALJ failed to properly consider either subjective symptom testimony or medical opinion evidence, it is sometimes appropriate to credit the evidence as true and remand the case for calculation and award of benefits. See Garrison, 759 F.3d at 1019-21.

However, in <u>Ghanim</u>, 763 F.3d at 1166, a case decided after <u>Garrison</u>, another Ninth Circuit panel did not apply or even acknowledge the "credit as true" rule where substantial evidence did not support an ALJ's rejection of treating medical opinions and his adverse credibility determination; instead, the panel simply remanded the case for further administrative proceedings.  And, in <u>Marsh v. Colvin</u>, 792 F.3d 1170, 1173-74 (9th Cir. 2015), the panel did not apply or acknowledge the "credit as true" rule where the ALJ had failed to even mention a treating source's opinion that the claimant was "pretty much nonfunctional"; instead, the panel simply remanded the case to afford the ALJ the opportunity to comment on the doctor's opinions.

Here, although Plaintiff contends that "the decision of the Commissioner should be reversed for a calculation and award of benefits," (<u>see</u> Pl.'s Mot. at 25), the Commissioner has argued that the appropriate remedy in the event of reversal would be a remand for further administrative proceedings, (<u>see</u> Def.'s Mot. at 28-30).  The Court has concluded that remand for further proceedings is warranted because additional administrative proceedings could remedy the defects in the ALJ's decision.

For the foregoing reasons, this Court **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, that the Commissioner's cross-motion for summary judgment be **DENIED,** and that Judgment be entered reversing the decision of the Commissioner and remanding this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**IT IS ORDERED** that no later than **January 30, 2019**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **February 6, 2019**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those

/ / /

/ / /

objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  January 16, 2019

_____
Honorable Michael S. Berg
United States Magistrate Judge

18cv145-CAB(MSB)